STATE of Missouri ex rel. Karl G. MEYER, Elmer Boesel, Mrs. A. G. Merello, Raymond Kringer, Viola Fuchs, and Mrs. Pierre Belleville, Relators-Appellants,

v.

Robert KINEALY et al., Constituting the Board of Adjustment of the City of St. Louis, Missouri, and Paul E. Toelle, Respondents.

No. 31803.

St. Louis Court of Appeals.

Missouri.

March 15, 1966.

Rehearing Denied April 12, 1966.

Francis R. Stout, Richard M. Stout, Philip M. Sestric, William H. Crandall, Jr., St. Louis, for appellants.

1

Stewart & Bruntrager, Joseph G. Stewart, St. Louis, for respondents.

RUDDY, Judge.

This is an appeal by relators, appellants, from a judgment of the Circuit Court in a certiorari proceeding affirming an order of the Board of Adjustment of the City of St. Louis directing the issuance of a permit for the erection of an auto service station at 10055 Riverview Drive in the City of St. Louis, Missouri.

This property is located in North St. Louis and is bounded on the north by Spring Garden Drive and on the south by Old Chambers Road, which is no longer in use, but has never been vacated. The property fronts 195 feet along Riverview Boulevard and is irregularly shaped, approximately 150 feet in depth with a width of about 300 feet across the rear. Riverview Drive is the business route of U. S. Highway 66, a four lane highway, which runs in a generally north and south direction. The property is a short distance south of the Chain of Rocks Bridge and is in the vicinity of the City of St. Louis Water Works Plant. It lies at the bottom of a very steep hill. A drainage ditch runs through the property from northwest to southeast and is parallel with Spring Garden Drive and is about 85 feet south of the northern boundary of the property. The ditch drains the storm water and surface water on the property. There was evidence to show that the property is subject to flooding and at times one-third of the property is covered with water. At times the highway in front of the property becomes flooded and on occasions traffic cannot get through.

Paul Toelle and his ancestors have for over 100 years owned a substantial amount of land surrounding the aforedescribed property and also owned the property involved in this case. In 1946 he caused a portion of the land to be laid out in a subdivision known as Denness Hills and lots were sold by Toelle in this subdivision. This subdivision did not include any of the property involved but is close to it. The price range of the houses in the Denness Hills Subdivision is between $25,000 and $35,000. Other homes in the area sell for a price of $40,000 to $45,000. Immediately south of the property involved are houses in the price range of $13,950 to $14,950.

The property involved in this proceeding has been zoned as "A Residential" since 1950. On the property is an old frame building on the south end which has been there for 75 to 80 years and has been used at times as a saloon and store for the sale of fish. For approximately 35 years there have been two barns on the property used as livery and riding stables. Their use as livery stables existed prior to the zoning of the property as Class A Residential. Riverview Drive in the area of the property involved has been used by drag racers and along this drive many accidents have occurred. There was testimony by Mr. Toelle and others that before the property could be used for any construction purpose, whether residential or business, it would be necessary to construct and install a storm sewer along the ditch referred to and a minimum cost of constructing such a storm sewer would be $12,000. He did not know whether or not the property could be used for residential purposes if the storm sewer was installed. Mr. Toelle testified that he had an option to sell the property to the Mobil Oil Company who intend to build a filling station on the property involved which would entail a total investment of $100,000. There was some testimony that this was the best use of the property and would benefit the area. There was testimony that there were only three residential sites in the involved property and that the allocation of $4000 to each one of these lots to cover the cost of the sewer improvement would be impracticable since the homes in the area would have to stay within the $10,000 to $15,000 price range and the witness said this would be an impossible price with such a high cost for the land.

Some of the relators testified that there were no commercial buildings in the area

and that a filling station of the type proposed would tend to ruin the beauty of the residential neighborhood. One of the relators testified that his lot was approximately a half block from the site of the proposed filling station and that the majority of the houses in his neighborhood would range from $30,000 to $40,000. It seems that the owners of all of these houses had purchased their property from Mr. Toelle.

Relator's evidence also showed that the drainage ditch that crossed the property involved, drains a much greater area than the property in question; that much of the area referred to was formerly owned by Mr. Toelle or his family and that the cost of a drainage ditch should be allocated to these other properties. There was testimony that the Metropolitan Sewer District had a plan that would have eliminated the ditch and it seems that the plan would have avoided the expenditure of building an enclosed sewer in the ditch.

One witness testified that when she purchased the land on which her home stands, she and her husband were assured by Mr. Toelle that no filling station would be erected in the neighborhood.

There was some testimony to show that efforts had been made to have this property rezoned through a bill presented to the Board of Aldermen of the City of St. Louis and that the bill was "killed" in Committee. There was an exhibit, in the form of a letter from the City Plan Commission dated February 15, 1959, in which the Commission stated that the terrain difficulties in the involved property were no greater than those in other parts of the area and pointed out that the tract had the pronounced advantage of being relatively flat. It found that residential use was feasible and appropriate.

The hearing before the Board of Adjustment was the result of an appeal taken by Mr. Paul Toelle from an order of the Building Commissioner of the City of St. Louis denying his application for a building permit to erect an auto service station on the involved property.

The Board of Adjustment found, inter alia, "that the premises are located in the 'A' Single Family Dwelling District and on a busy thoroughfare"; that "the property has been in the Toelle family for over 100 years and has been used as a saloon, store, confectionery and fish store. For the past 35 years, it has been used as a livery stable"; that "the structures on the property * * * are fairly unsightly and detract from and have an adverse effect on properties in the surrounding area"; that "horses have been and, are now, quartered on the property"; that "the premises are located at the bottom of a steep grade in somewhat of a pocket"; that the property involved and the "adjacent highway is flooded during rainstorms and prolonged rains"; that this is caused by the open drainage ditch; that "before any new structure can be erected on this property, it would be necessary to spend" $12,000 for sewers to correct the flooding problem.

In its conclusion of law and decision it ruled "that under the evidence adduced that the petitioner established an unnecessary hardship within the meaning of Section 916.050(4); that to require strict compliance with the letter of the ordinance would deprive the petitioner of the reasonable use of his property *because it cannot be used for the purpose for which it was zoned * *.* The Board, therefore, grants the petitioner a variance within the terms of the Ordinance to use the property in question for service station purposes, under the plan submitted, such variance being within the spirit of the Code." It further ruled: "Therefore, be it resolved by the Board of Adjustment that the decision of the Building Commissioner in refusing to issue this permit for the erection of an auto service station at 10055 Riverview Drive be reversed." As we have said, the Circuit Court affirmed the order of the Board of Adjustment.

As has been shown the property involved is in the "A" Single Family Dwelling Dis-

trict. We need not detail the use regulations governing that district, but it is sufficient to say that it is undisputed that the "A" Single Family Dwelling District does not include or permit filling stations. The City of St. Louis Zoning Ordinances place and classify filling stations under District "F" Local Business. The districts classified A, B, C, D, and E authorize a permitted use, respectively, as single family dwellings, two family dwellings, four family dwellings, multiple-family dwellings, and multiple-family dwellings including a permitted use as hotels. It is seen that the erection and operation of filling stations is not permitted under any of the zoning classifications prior to "F."

The legislative body of the City of St. Louis passed a comprehensive zoning code pursuant to the powers given it under the provisions of Chapter 89 RSMo. 1959, V.A. M.S. The Board of Adjustment was created by the legislative body of the City of St. Louis pursuant to § 89.080 of the aforementioned chapter. Section 89.090 specifies the powers of the Board of Adjustment and the provisions of said section (Par. 1) pertinent to our inquiry is as follows:

"(3) In passing upon appeals, where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such ordinance, to vary or modify the application of any of the regulations or provisions of such ordinance relating to the use, construction or alteration of buildings or structures or the use of land so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done."

■ The powers of the Board of Adjustment, specified in subdivision (4) of § 916.050 of the Zoning Code are similar in all pertinent respects to subdivision (3) (Par. 1) of § 89.090 RSMo. 1959, V.A.M.S. This provision of the ordinance must be consistent with the Enabling Act, namely, § 89.090, supra; if not, that which is incon-

sistent is a nullity. State ex rel. Nigro v. Kansas City, 325 Mo. 95, 27 S.W.2d 1030.

■ While the brief of the Board of Adjustment and Paul Toelle, owner of the premises, does not urge that Paul Toelle is entitled to a permit to erect the filling station upon his premises by virtue of the nonconforming use provision of the ordinance, which provision we see no need to recite here, nevertheless, we do feel the need to make some comment on this because of the finding by the Board of Adjustment that the property, prior to the enactment of the Zoning Code and since, has been used as a saloon, store, confectionery and fish store, and for the past 35 years has been used as a livery stable. It is undisputed that the property was not being used at the time of the adoption of the Zoning Code as a filling station and consequently Paul Toelle is not entitled to a permit to erect a filling station by virtue of the nonconforming use provision of the Zoning Code. In re Botz, 236 Mo.App. 566, 159 S.W.2d 367, l. c. 372.

The Board and Paul Toelle contend that the evidence shows that an unnecessary hardship exists and that the Board acted within its jurisdiction and did not abuse its discretion in granting a permit to erect a service station, because for the reasons given by the Board in its findings and conclusions the property is not suited for any residential use. These respondents say that the property is useless for the purpose for which it is zoned or for any residential use and that the highest and best use for the property is as a service station.

■ The respondents say that the scope of our review is limited to a determination of whether, upon the whole evidence, there is competent and substantial evidence to support the findings and decision of the Board of Adjustment. The scope of our review is not so limited. In the case of State ex rel. Nigro v. Kansas City, supra, the Supreme Court in discussing the jurisdiction of the Circuit Court when reviewing

a decision of a Board of Zoning Appeal, said:

"Looking to the statute it is apparent that the court is not vested with the power to supervise the discretion lodged with a board of zoning appeals; it is not authorized to entertain a hearing de novo and then make such order as in its opinion the board should have made. *The court's authority is plainly limited to correcting illegality.* If the court finds the order under review illegal, in whole or in part, it may reverse or affirm, wholly or partly, or may modify, the order, as may be necessary in order to correct the illegality." (Emphasis ours.) (27 S. W.2d l. c. 1033).

The same powers and limitations imposed upon the Circuit Court in its review of the decision of the Board of Adjustment are applicable to this court in our review of the decision of the Circuit Court in the certiorari proceeding. Brown v. Beuc, Mo. App., 384 S.W.2d 845, l. c. 851.

■ We will assume, without so ruling, that the Board of Adjustment was correct in finding that an unnecessary hardship existed within the meaning of § 916.050 (4) of the Zoning Code, nevertheless, we find, as we shall point out, that the Board of Adjustment exceeded its power and authority when it found, that to require of Paul Toelle strict compliance of the ordinance would deprive him of the reasonable use of his property "because it cannot be used for the purpose for which it was zoned" and under the guise of a variance permits the use of the property involved "for service station purposes." This action constitutes a change of the zoning of the property involved, which was beyond the jurisdiction of the Board of Adjustment. In doing so, the said Board usurped the legislative zoning powers of the Board of Aldermen of the City of St. Louis.

In a case recently decided by this court, State of Missouri ex rel. Sheridan, et al. v.

Hudson, et al., 400 S.W.2d 425, we reached the conclusion, as did both the Board and the trial court, that because of the obvious practical difficulties which prevented the owners from economically using the land for single family dwellings, to deny them the right to use it for multiple dwellings would be tantamount to a taking or confiscation of their land in the constitutional sense, citing Huttig v. City of Richmond Heights, Mo., 372 S.W.2d 833.

Despite this conclusion reached by us, we held that the power of the Board of Adjustment did not extend to granting a variance for a nonconforming use. Our authority for so holding is found in the case of State ex rel. Nigro v. Kansas City, supra.

As pointed out in our case, the language of the ordinance under consideration in the Nigro case was substantially the same as that contained in § 89.090, subd. 1(3). The same is true of the Zoning Code Ordinance of the City of St. Louis, to which the Board of Adjustment of the City of St. Louis must look for its powers.

In delineating the powers of the Board of Adjustment (named the Board of Zoning Appeals in Kansas City) to grant a variance for a nonconforming use the Supreme Court said:

"* * * The board of zoning appeals is intrusted with the duty of enforcing the provisions of the ordinance; it is an administrative body, without a vestige of legislative power. It cannot therefore modify, amend, or repeal what the ordinance itself designates as its 'general rules and regulations'; the power to do that is conferred upon the common council of Kansas City, and it can delegate no part of that power. The ordinance does not purport to authorize the board of zoning appeals to modify, amend, or repeal any of its provisions; but it does permit and direct the board to modify or partially suspend a rule in its application

to a particular case where strict enforcement would 'by reason of exceptional circumstances or surroundings constitute a practical difficulty or unnecessary hardship.' This provision must be read in connection with section 7 of the Enabling Act, which provides that the board of adjustment shall have the power, 'where there are practical difficulties or unnecessary hardship in the way of carrying out the strict letter of such ordinance, to vary or modify the application of any of the regulations or provisions of such ordinance relating to the use, construction or alteration of buildings or structures or the use of land so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done.' In other words, if in a specific case the enforcement of a regulation according to its strict letter would cause unnecessary hardship and the board can by varying or modifying the application of the regulation obviate the hardship and at the same time fully effectuate the spirit and purpose of the ordinance, they are authorized to so vary or modify the application. But the board can in no case relieve from a substantial compliance with the ordinance; their administrative discretion is limited to the narrow compass of the statute; they cannot merely pick and choose as to the individuals of whom they will or will not require a strict compliance with the ordinance. State v. Christopher, 317 Mo. 1179, 1196, 298 S.W. 720." (27 S.W.2d 1. c. 1032).

In the instant case the effect of the order of the Board of Adjustment is to rezone the property involved from the classification of district "A" Single Family Dwelling to district "F" Local Business, and it is quite apparent from the language of the Board of Adjustment in its conclusions of law and decision that it intended to change the zoning of the property when it said that "it cannot be used for the purpose for which it was zoned."

In the Nigro case, supra, the court further said:

"* * * What he (respondent) in fact asked the board of zoning appeals to do was to 'rezone' the corner on which his property is located, that is, change the boundaries between the residential district in which it is situated and the adjoining business district so that his lot would fall within the latter district. This, as already pointed out, the board was powerless to do; the common council only is authorized to change the boundaries. Section 5, Enabling Act. If the board has heretofore attempted such rezoning, as the record suggests, its acts in that respect were nullities." (27 S.W. 2d 1. c. 1032).

We have quoted rather copiously from the Nigro opinion in order to show the Board of Adjustment that it cannot amend or repeal any zoning ordinance or rezone any property or amend or repeal any rule or regulation of the Zoning Code. The power to amend or repeal any provision of the Zoning Code belongs to the legislative body of the City of St. Louis and not to the Board. The Board is without a vestige of legislative power. State ex rel. Nigro v. Kansas City, supra; Brown v. Beuc, supra, and cases cited therein.

As pointed out in our recent case of State of Missouri ex rel. Sheridan et al., v. Hudson, et al., supra, we are bound to follow the decision of the Supreme Court in State ex rel. Nigro v. Kansas City, and in view of that decision, we are constrained to hold in the instant case that the Board of Adjustment had no power to grant Paul Toelle a permit to erect a filling station upon the involved property because by doing so it attempted to change the zoning from district "A" to district "F."

For the reasons indicated heretofore, we find that the Board of Adjustment exceeded its authority in granting the variance and in making its finding and order. Therefore, the judgment of the Circuit

Court should be reversed and the cause should be remanded for proceedings in conformity with views herein expressed. It is so ordered.

WOLFE, P. J., and WILLIAM E. BUDER, Special Judge, concur.